United States District Court
Southern District of Texas
**ENTERED**
February 28, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES M. GUTHRIE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-12-1761 |
| | § | |
| KOKILA  NIAK, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending are Defendants Naik's, Williams's, Ahmad's, and Dostal's Motion for Summary Judgment (Docket Entry No. 249) and Defendants Hudspeth's and Miller's Motion for Summary Judgment (Docket Entry No. 251).  Plaintiff James M. Guthrie has not filed a response to either motion.  The Court has considered the motions, record, evidence, arguments of the parties, and applicable law, and concludes that the motions should be granted and this case should be dismissed.

## I.    Background

Plaintiff James M. Guthrie ("Plaintiff"), a former prisoner,[1]  filed two civil rights lawsuits under 42 U.S.C. § 1983 which have now been consolidated. *See Guthrie v. Naik*, Civ. A. No. H-12-1761 (S.D. Tex. 2012) (*consolidated with Guthrie v. Hudspeth*, Civ. A. No. H-13-2774 (S.D. Tex. 2013)).   Plaintiff claims in *Naik* that certain medical officials breached a settlement agreement arising out of a lawsuit Plaintiff filed in 2007 and that they violated his Eighth Amendment rights in connection with providing him medical care.  *Naik*, Civ. A. No. H-12-

---

[1] It is undisputed that Plaintiff is no longer incarcerated in any unit of the Texas Department of Criminal Justice nor under the care or control of any named Defendant. *See Naik*, Docket Entry No. 249 at 21.

1761, at Docket Entry No. 1. In *Hudspeth*, Plaintiff alleges that certain security officials retaliated against him for filing *Naik*. *Hudspeth*, Civ. A. No. H-13-2774, at Docket Entry Nos. 1, 7, 31. At the time of the events that form the basis of this consolidated action, Plaintiff, who proceeds *pro se* and *in forma pauperis*, was in the custody of the Texas Department of Criminal Justice–Correctional Institutions Division ("TDCJ") and incarcerated at the Jester III Unit in Richmond, Texas.[2]

Plaintiff suffers from Complex Regional Pain Disorder ("CRPD"), a chronic pain disorder which principally affects his right hand and leg.[3] Because of his chronic pain, Plaintiff claims that he must have a wheelchair and daily doses of strong pain medication.[4] While incarcerated, he was treated off and on for hepatitis C and other ailments, including an injury to his eye.[5]

Back in 2007, Plaintiff sued a number of medical personnel working at TDCJ, alleging that they wrongfully stopped his hepatitis C treatments and had taken away his wheelchair, which he claimed prevented him from accessing food, showers, and medicine because he could not walk to those services. *See Guthrie v. Halupes*, Civ. A. No. H-07-3853, Docket Entry No. 1 (S.D. Tex. 2008) (Ellison, J.). On February 1, 2008, the *Halupes* court granted a temporary injunction, directing the defendants to "take any and all actions necessary to reinstate, administer, and continue, until further order of this Court, plaintiff's interferon and ribavirin hepatitis C antiviral therapy, and to provide plaintiff a wheelchair for his use in obtaining the

---

[2] *See Naik*, Docket Entry No. 1 at 1; *Hudspeth*, Docket Entry No. 1 at 1.

[3] *See Naik*, Docket Entry No. 2 at ¶ 1.

[4] *Id.* at ¶¶ 11-12, 14.

[5] *Id.* at ¶¶ 5, 16.

2 / 34

antiviral therapy as regularly scheduled." *Id.* at Docket Entry No. 30 at 1-2.   The parties thereafter entered a settlement agreement on August 1, 2008 and voluntarily dismissed that case. *Id.* at Docket Entry Nos. 85 & 87.

Plaintiff reports that from the time the temporary injunction was granted in 2008 until February 24, 2011, he was housed in various infirmaries in TDCJ Units, including the Carol Young Unit, the Ramsey Unit, and the Stiles Unit.[6]  Plaintiff was transferred to the Jester III Unit infirmary on February 24, 2011.[7]  Defendants Dr. Kokila Naik, then-Director of the Physically Handicapped Offender Program ("Naik"), and Dr. Aftab Ahmad, then-Medical Director at Jester III ("Ahmad"), both approved Plaintiff's placement in the infirmary.[8]

On February 25, 2011, Naik assessed Plaintiff for therapy and noted that previous rehabilitation had produced good results for Plaintiff.[9]   The medical records indicate that Naik encouraged Plaintiff that he could retain function in his arm and leg and that therapy would strengthen him and decrease his pain.[10]   The treatment plan involved physical therapy 3-5 times per week for 4-6 weeks.[11]   In addition to the physical and occupational therapy regimen, Plaintiff regularly saw Ahmad for pain management.[12]

---

[6] *See Naik*, Docket Entry No. 2 at ¶¶ 5, 8-9.

[7] *See Naik*, Docket Entry No. 249-4, Ex. C ("Medical Records Vol. I") at Guthrie 2.

[8] *Id.* at Guthrie 3-4.

[9] *Id.* at Guthrie 11-12.

[10] *Id.*

[11] *Id.* Guthrie 14.

[12] The medical records reflect that Ahmad treated Plaintiff for pain or generally provided him care on over thirty occasions from March 8, 2011 until Ahmad resigned from his position as Jester III Medical Director on October 20, 2012. *See Naik*, Docket Entry No. 249-3, Ex. B ("Affidavit of Steven Bowers, M.D.") at 4-17; Medical Records Vol. I at Guthrie 16 (Mar. 8, 2011), Guthrie 18 (Mar. 18, 2011), Guthrie

On March 1, 2011 Plaintiff began physical therapy.[13]  Physical therapy progress notes in Plaintiff's medical record reflect that on April 22, 2011, Plaintiff was able to push his wheelchair from the infirmary to the physical therapy department and walk with the rolling walker two laps around the gym with one rest period.[14]  He was also able to bench press 280 pounds in two repetitions on that date.[15]  On May 23, 2011, the medical records reflect that Plaintiff reported to physical therapy without complaints, pushed his wheelchair from the infirmary to the physical therapy department, and walked using a rolling walker for three laps around the gym without rest periods.[16]  At this appointment, the physical therapist told Plaintiff that the goal of the therapy was to make him ambulatory so that he would not need a wheelchair.[17]

Plaintiff reported to physical therapy on May 25, 2011, but his regular therapist was not there and so he only received occupational therapy.[18]  Between May 25, 2011 and July 18, 2011,

---

21 (Apr. 17, 2011), Guthrie 30 (May 2, 2011), Guthrie 55 (May 23, 2011), Guthrie 59 (May 25, 2011), Guthrie 65 (Jun. 13, 2011), Guthrie 80-81 (Jun. 27, 2011), Guthrie 87 (Jul. 19, 2011), Guthrie 115 (Aug. 15, 2011) (chart review), Guthrie 122 (Sep. 21, 2011) (Nurse Rogers), Guthrie 137 (Nov. 15, 2011), Guthrie 146 (Dec. 13, 2011) (sick call), Guthrie 159 (Jan. 17, 2012), Guthrie 161 (Feb. 1, 2012), Guthrie 167 (Feb. 24, 2012), Guthrie 174 (Mar. 5, 2012), Guthrie 179 (Mar. 21, 2012), Guthrie 182 (Apr. 13, 2012), Guthrie 188 (Apr. 17, 2012), Guthrie 192 (May 4, 2012), Guthrie 196 (May 16, 2012), Guthrie 210 (May 29, 2012), Guthrie 223 (Jun. 12, 2012), Guthrie 230 (Jul. 2, 2012), Guthrie 240 (Jul. 30, 2012), Guthrie 258 (Aug. 5, 2012), Guthrie 266 (Aug. 6, 2012), Guthrie 268 (Aug. 9, 2012), Guthrie 276 (Aug. 22, 2012), Guthrie 278 (Aug. 31, 2012), Guthrie 281 (Sep. 5, 2012).  The records also show that Ahmad regularly prescribed pain medication and that he sought and eventually received approval for Plaintiff to take morphine.  *See, e.g., Naik*, Medical Records Vol. I at Guthrie 282 (medical pass for morphine elixir).

[13] *Id.* at Guthrie 14.

[14] *Naik*, Medical Records Vol. I, at Guthrie 28.

[15] *Id.*

[16] *Id.* at Guthrie 33.

[17] *Id.* at Guthrie 33-35.

[18] *Id.* at Guthrie 58.

Plaintiff refused physical and occupational therapy on several occasions.[19]   On June 21, 2011, the medical records reflect that Plaintiff's progress was reviewed at a staff meeting with the physical and occupational therapists who noted that Plaintiff was able to perform the activities of daily living without assistance, had done well in therapy, and would be considered for discharge from the infirmary.[20]   On July 19, 2011, Plaintiff was issued a walker and a medical pass and was discharged from the infirmary.[21]   He was moved to the dorm on July 22, 2011 without his wheelchair.[22]

On July 26, 2011, the medical records reflect that security officials contacted the medical department because Plaintiff had passed out in the shower.[23]   When medical personnel arrived, Plaintiff was alert and responsive but complained that he could not tolerate the heat.[24]   Plaintiff was given his medications and released to security, who transported him to his dorm via a wheelchair.[25]

That same afternoon, Defendant Susan K. Dostal, Medical Practice Manager for the Jester III Unit ("Dostal"), came by Plaintiff's dorm and moved him to another dorm which was closer to the dining area and other services.[26]   Dostal noted in an email that Plaintiff did not

---

[19] *Id.* at Guthrie 36-54, 85-86

[20] *Id.* at Guthrie 68-69.

[21] *Id.* at Guthrie 87-89 (Discharge Summary).

[22] *Id.* at Guthrie 91.

[23] *Id.* at Guthrie 100.

[24] *Id.*

[25] *Id.* at Guthrie 101.

[26] *Id.* at Guthrie 91.

request that he be returned to the infirmary or that he be issued a wheelchair.[27]  Plaintiff was a no-show for his appointment with Assistive Disability Services on July 27, 2011.[28]  On August 2, 2011, Naik and Physician Assistant Melanie Potter sent for Plaintiff from his dorm in order for Plaintiff to be seen because he had not been showing up for his hepatitis C treatments.[29]  Naik reports that she told Plaintiff that she would reissue his wheelchair for the duration of his hepatitis C treatments if he would come for his hepatitis C medication.[30]

On November 4, 2011, Defendant Dr. Gwenevere Williams ("Williams") began working at the Jester III Unit.[31]  On December 22, 2011, Naik, Ahmad, Williams, and Dostal (collectively, the "Medical Defendants") met with Plaintiff to discuss his progress and told Plaintiff that they were planning to take away his wheelchair when he finished his hepatitis C treatments.[32]  Plaintiff alleges that the meeting was designed to intimidate him into giving up his wheelchair.[33]  Naik retired effective December 31, 2011.[34]

On February 24, 2012, Plaintiff saw Ahmad, who informed Plaintiff that a University of Texas Medical Branch ("UTMB") committee would deal with his issues regarding assisted living

---

[27] *Id.*

[28] *Id.* at Guthrie 103.

[29] *Id.* at Guthrie 110-112.

[30] *Id.* at Guthrie 91.

[31] Affidavit of Steven Bowers, M.D. at 10; *see also Naik*, Docket Entry No. 249-5 ("Medical Records Vol. II") at Guthrie 137.

[32] Medical Records Vol. II at Guthrie 151-52.

[33] *Naik*, Docket Entry No. 10 at 2.

[34] Medical Records Vol. II at Guthrie 153.

and a wheelchair.[35]  Plaintiff alleges that Dostal, as Medical Practice Manager, was on the wheelchair committee and was the "gatekeeper" or primary force behind the plan to take away his wheelchair.[36]

On March 29, 2012, Plaintiff wrote a letter to Dostal which he includes in his pleadings, requesting a permanent wheelchair assignment.[37]   In response, Dostal indicated that the wheelchair committee met on May 8, 2012 and decided that: (1) Plaintiff should remain at the wheelchair level; (2) the unit doctor would manage his pain with long acting and breakthrough medications; (3) he would be seen weekly, alternating nursing and doctor visits; and (4) occupational and physical therapy would continue with a goal of Plaintiff walking.[38]   The medical records reflect, and Plaintiff does not dispute, that the only time Plaintiff's wheelchair was taken away while he was at Jester III was from July 22, 2011 to August 2, 2011.[39]

On April 9, 2012, Williams evaluated Plaintiff and noted that he did not need assisted living because he was able to perform activities of daily living.[40]  She recommended that he be housed in a smaller facility where distances were short and where he could walk short distances

---

[35] *Id.* at Guthrie 167.

[36] *Naik*, Docket Entry No. 10 at 11-12.

[37] *Naik*, Docket Entry No. 2-1 at 7 of 30 ("3-29-12 Letter to Dostal").

[38] *Id.*

[39] *See, e.g.*, Medical Records Vols. II & III at Guthrie 196, 210, 223, 230, 267, 275, 280, 288, 292, 310, 322, 330 (reflecting that Plaintiff is in wheelchair).  The medical records also reveal that Plaintiff was provided a wheelchair in April 2013 while he was at Jester IV on suicide watch, provided he would agree not to harm himself or others.  *See Naik*, Docket Entry No. 249-7 ("Medical Records Vol. IV") at Guthrie 353.

[40] Medical Records Vol. II at Guthrie 183-84.

to all of the services.[41]   Plaintiff alleges that Williams told him she believed that there was nothing wrong with him and that she would do whatever she could to stop further treatment.[42] Plaintiff claims that Williams's evaluation contradicted all of his other care providers' assessments and that she wrote incorrect or false information in his medical report which caused him harm.[43]   Plaintiff also alleges that Williams harassed him with innuendo and snide remarks.[44]

On May 16, 2012, Ahmad met with Plaintiff and told Plaintiff that the wheelchair committee decided that he would be left in his wheelchair with the hope that he would attain independent mobility with a walker.[45]   Ahmad also told Plaintiff that his present housing would not change because he was already in a climate controlled dorm.[46]

On June 12, 2012, Plaintiff filed the above-referenced lawsuit seeking to enforce the terms of the 2008 settlement agreement and claiming that the Medical Defendants were deliberately indifferent to his serious medical needs.[47] He seeks declaratory relief that the defendants violated the 2008 settlement agreement; injunctive relief of permanent wheelchair assignment, pain medication, and a second eye surgery; and compensatory and nominal

---

[41] *Id.*

[42] *Naik*, Docket Entry No. 10 at 3.

[43] *Id.* at 3-4

[44] *Id.* at 4.

[45] Medical Records Vol. II at Guthrie 196.

[46] *Id.*

[47] *Naik*, Docket Entry No. 1 at 1.  Although Plaintiff purported to date it on June 25, 2012, *see id.* at 6 of 7, the Court received his lawsuit on June 12, 2012.

damages.[48]

On September 13, 2013, Plaintiff filed a related suit contending that security personnel at Jester III — particularly  Warden Monty Hudspeth ("Hudspeth"), Captain Miller ("Miller"), and Major Clark ("Clark")[49] — retaliated against him for filing *Naik*.[50] Plaintiff alleges that on December 6, 2012, Hudspeth threatened and harassed Plaintiff, stating that he would lock Plaintiff up, take away his parole, and take away his security class if Plaintiff did not drop his lawsuit against the Medical Defendants.[51]  On January 21, 2013, over six weeks later, two officers allegedly ransacked Plaintiff's cubicle and confiscated or stole his personal property including some legal materials.[52]  Plaintiff claims that he was placed in Administrative Segregation about a week after the shakedown based on an allegedly fabricated threat to Plaintiff's life.[53]

On March 4, 2013, Plaintiff claims he could not breathe and was in pain and asked the guard for help, but the officer walked away after telling Plaintiff to go to the pill counter.[54] When Plaintiff continued to bang on the door, another officer came and took him to the medical

---

[48] *Id.* at 5 of 7.

[49] *See Hudspeth*, Docket Entry No. 1 at 5.  Because the gravamen of Plaintiff's retaliation case centers around Warden Hudspeth's alleged "command influence" to retaliate against Plaintiff, only Hudspeth, Miller, and Clark have been served and have answered.  *Id.*, Docket Entry Nos. 42, 46.

[50] *See Hudspeth*, Docket Entry No. 1 at 4 of 5; *id.*, Docket Entry No. 3 at 1-2; *see also id.*, Docket Entry No. 31 ("More Definite Statement").  To the extent that Plaintiff attempts to assert claims against other defendants, the claims against those officials are dismissed without prejudice as improperly joined.  *See* FED. R. CIV. P. 21.

[51] *Hudspeth*, Docket Entry No. 1 at 4.

[52] *Id.*, Docket Entry No. 7 at ¶ 8.

[53] *Id.* at ¶ 11.

[54] *Id.*, Docket Entry No. 31 at 7.

department, but wrote him a disciplinary case for causing a disturbance.[55]  Plaintiff alleges that

he was placed in  administrative segregation the next day because of another purported threat on

his life.[56]  He allegedly remained in administrative segregation for approximately ten days.[57]

Plaintiff also complains that, because Jester III is a small unit and everybody knows

everybody, he has unfairly received a reputation for being a trouble maker.  Plaintiff recounts

fragments of overheard conversations and other "innuendo" from the guards and laments that he

felt like he had a reputation "across the entire unit and seemed to be the talk of the unit."[58]

Around April 2013, Plaintiff alleges that the unfair treatment he received from the

Defendants became too much for him to handle, and he was sent to Jester IV Unit for about a

month for psychiatric evaluation.[59]  On May 10, 2013, Plaintiff returned to Jester III, but when

he was transferred back to the unit, he allegedly was left in a hot car for 45 minutes and passed

out due to the heat.  Plaintiff claims that when he woke up, officers at Jester III, including Miller,

laughed at him but took him to the medical department.[60]

On June 1, 2013, Plaintiff allegedly received a disciplinary for asking his mother to relay

messages to another inmate, which officials at the Jester III Unit considered to be a violation of

TDCJ rules.[61]  Plaintiff does not deny that he had his mother relay the information but alleges

---

[55] *Id.*

[56] *Id.*, Docket Entry No. 7 at ¶ 15.

[57] *Id.*

[58] *Id.*, Docket Entry No. 7 at ¶ 18.

[59] *Id.*

[60] *Id.*

[61] *Id.* at ¶ 19.

that the other inmate was a co-plaintiff in another case.  He asserts that he did not violate the rules and therefore the disciplinary charge was retaliatory.[62]

Hudspeth allegedly called Plaintiff's mother and told her that she had violated TDCJ rules by relaying the messages.[63]  Plaintiff alleges that the phone call greatly distressed his 90-year-old mother so much that she was hospitalized.[64]  Plaintiff wrote a grievance against Hudspeth for calling and distressing his mother.[65]

On June 21, 2013, Plaintiff went to call his mother, but an officer in the hallway allegedly stopped him and wrote him up for being "out of place."[66] When Plaintiff argued with the officer, he received another disciplinary case for threatening an officer.[67]  Plaintiff claims that the officer lied about what Plaintiff said to him in the hall.[68]

Plaintiff also alleges that Miller presided over the case where his mother had, at Plaintiff's request, relayed information to another offender.[69]  Plaintiff alleges that he was not allowed to call witnesses and that he proved from the handbook that his and his mother's behavior was not against the TDCJ rules, but he was convicted anyway.[70]  Plaintiff alleges that

---

[62] *Id.*

[63] *Id.* at ¶ 20.

[64] *Id.*

[65] *Id.*

[66] *Id.*, Docket Entry No. 31 at 6.

[67] *Id.*; *Hudspeth*, Docket Entry No. 7 at ¶ 8.

[68] *Id.*

[69] *Id.*, Docket Entry No. 7 at ¶ 19.

[70] *Id.*

Miller indicated that Hudspeth wanted a conviction on this disciplinary case.[71]  Plaintiff claims

that he overheard Hudspeth say to Miller, "good job on Guthrie!", which Plaintiff construed as

confirmation that Hudspeth was directing the disciplinary proceedings.[72]  Plaintiff acknowledges

that he only heard a portion of the conversation and did not hear what preceded the fragment he

heard.[73]

Plaintiff alleges that every time he had a disciplinary case in front of Miller he had good

time taken away and spent time in administrative segregation and lost earning class status.[74]

Plaintiff seeks the restoration of his good time and class status; compensatory damages; and

nominal damages for the alleged retaliation.[75]

According to the undisputed record, Plaintiff was released from prison in September of

2015.[76] On March 30, 2016, the Court granted Plaintiff's motion to voluntarily dismiss Major

Clark.[77]

The Medical Defendants and Hudspeth and Miller now move for summary judgment,

contending that Plaintiff does not raise a fact issue on any of his claims and that they fail as a

matter of law.

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.* at ¶ 25 (p. 10 of 19).

[75] *Hudspeth*, Docket Entry No. 1 at 5 of 6.

[76] *See Naik*, Docket Entry No. 239 (Plaintiff's change of address notice); *see also id.*, Docket Entry No. 249 at 16.

[77] *See Naik*, Docket Entry No. 242 at 4, 6.

## II.    Standard of Review

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).  The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant.  *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings.  *See Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998); *see also Johnston v. City of Houston,* 14 F.3d 1056, 1060 (5th Cir. 1994) ("Unsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence."). Likewise, the nonmoving party "cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Freeman v. Tex. Dep't of Crim. Justice,* 369 F.3d 854, 860 (5th Cir. 2004) (citations omitted).

In the absence of proof, a reviewing court will not assume that the nonmovant could or would prove the necessary facts.  *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir. 1995), *revised on other grounds upon denial of reh 'g,* 70 F.3d 26 (5th Cir. 1995).  Although the plaintiff proceeds *pro se,* "the notice afforded by the Rules of

Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail,* 975 F.2d 192, 193 (5th Cir. 1992).

A motion for summary judgment "cannot be granted simply because there is no opposition." *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995). When no response is filed, however, the Court may accept as undisputed the facts set forth in support of the unopposed motion and grant summary judgment when a prima facie showing for entitlement to judgment is made. *See Eversley v. Mbank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988); *Rayha v. United Parcel Serv., Inc.*, 940 F. Supp. 1066, 1068 (S.D. Tex. 1996).

## III.    Plaintiff's Claims for Declaratory and Injunctive Relief

Plaintiff indisputably is no longer incarcerated in any unit of the TDCJ and is no longer under the care of, nor subject to, any of the defendants.[78] Plaintiff's release from prison renders his claims for injunctive and declaratory relief moot. *See Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (inmate's transfer out of a unit "rendered his claims for declaratory and injunctive relief moot"); *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). Plaintiff does not contest that these claims are now moot. Accordingly, Plaintiff's requests for declaratory and injunctive relief are dismissed as moot.

## IV.    Official Capacity Claims against all Defendants

To the extent that any of the defendants are sued in their official capacity for monetary damages, such claims are barred by the Eleventh Amendment of the United States Constitution. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extent to any suit in law or equity, commenced or prosecuted against one of the

---

[78] *See Naik*, Docket Entry No. 249 at 21.

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S.
CONST. amend XI.

It is well settled that the Eleventh Amendment bars a recovery of money damages under
42 U.S.C. § 1983 from state employees in their official capacity.  *See Oliver*, 276 F.3d at 742;
*Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).  To the extent
that Plaintiff seeks money damages from any of the defendants in this case for his constitutional
claims, the Eleventh Amendment bars his claims against all of the defendants in their official
capacity as state employees.  *See Oliver*, 276 F.3d at 742.   Accordingly, the Court will grant
defendants' motions for summary judgment on this issue and will dismiss Plaintiff's request for
monetary damages against them in their official capacity for the constitutional claims.

## V.      Individual Capacity Claims--Qualified Immunity

The Medical Defendants, Hudspeth, and Miller each assert their entitlement to qualified
immunity from the claims against them in their individual capacity, contending in each case that
Plaintiff cannot demonstrate a constitutional violation.  Public officials acting in the scope of
their authority generally are shielded from civil liability by the doctrine of qualified immunity.
*See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but the
plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335,
341 (1986).  As a result, courts will not deny qualified immunity unless "existing precedent . . .
placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S.
731, 741 (2011).  Therefore, a plaintiff seeking to overcome qualified immunity must show: "(1)
that the official violated a statutory or constitutional right, and (2) that the right was 'clearly
established' at the time of the challenged conduct."  *Id.* at 735 (citation omitted).

### A.    The Medical Defendants

Plaintiff alleges that the Medical Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment, which prohibits "cruel and unusual punishment."   U.S. CONST. amend. VIII.   "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an unnecessary and wanton infliction of pain." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (internal quotation marks and citation omitted).   To state a claim for deliberate indifference, a plaintiff must plead facts to show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Lawson v. Dallas County,* 286 F.3d 257, 262 (5th Cir. 2002); *Cantu v. Jones*, 293 F.3d 839, 844 (5th Cir. 2002).

"Deliberate indifference is an extremely high standard to meet" because a plaintiff must demonstrate that the defendants "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would evince a wanton disregard for any serious medical need.'" *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).   A delay in medical care can rise to the level of a constitutional violation only if the delay is occasioned by deliberate indifference resulting in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

### 1.   Naik

Plaintiff alleges that Naik falsified her notes in his medical record, wrongfully removed him from assisted living, took away his wheelchair from July 22, 2011 to August 2, 2011, and denied him pain medication.  He also alleges that she tried to intimidate him and threatened to take away his wheelchair once he had completed his hepatitis C treatments.

First, Plaintiff's allegation that Naik falsified his medical records has no basis in the evidence.  The Fifth Circuit requires such a claim to be supported by facts.  *See Mathis v. Alexander*, 49 F.3d 728, No. 94–40757, 1995 WL 103646, *4 (5th Cir. March 3, 1995). Conclusory allegations that medical records have been falsified are insufficient to defeat a motion for summary judgment.  *Knighten v. Ott*, 69 F. App'x 657, No. 02–41163, 2003 WL 21355964, (5th Cir. May 21, 2003) (conclusory allegations that prisoner's "medical records were falsified is insufficient to defend medical defendants' summary-judgment evidence or to create a genuine issue of material fact").  The record reflects no evidence of falsification, and Plaintiff offers nothing to support this claim.  Accordingly, Naik is entitled to summary judgment on Plaintiff's claim that she falsified his records.

Second, Plaintiff's allegations that Naik acted with deliberate indifference by failing to prescribe certain medications, threatening him, and taking away his wheelchair for eight days are refuted by the medical records and by the expert testimony of Steven Bowers, M.D. ("Dr. Bowers").  The medical records show that Naik treated Plaintiff on numerous occasions between February 25, 2011 and December 31, 2011, when she retired, and that Naik did not refuse to treat him, or intentionally treated him incorrectly, or delayed any treatment of Plaintiff.

In particular, the medical records indicate that Naik evaluated Plaintiff on February 25, 2011 when he first arrived at the Jester III Unit infirmary for rehabilitation and that she

developed a plan for his physical and occupational therapy. On April 18, 2011, although Plaintiff was not on her list to be seen, Naik observed him while he was at physical therapy.  Naik noted that Plaintiff was riding one of the exercise bikes with both hands on the handles and kept his balance on the bike while not appearing to be in any significant pain.[79]

The medical records further show that between February 2011 and July 2011 Plaintiff had made significant progress, walking with a rolling walker around the gym and bench-pressing 280 pounds.[80]  After Plaintiff was told in late May 2011 that the goal was to help him become ambulatory, he refused numerous therapy sessions.[81]  Based on Plaintiff's progress with physical therapy where he demonstrated an ability to walk with the aid of a rolling walker, it was objectively reasonable for Naik and the other medical professionals to conclude that Plaintiff could be discharged from the infirmary and use a rolling walker to walk short distances in the unit.  When it became evident that Plaintiff would not use the walker to get his hepatitis C medication, medical staff, including Naik, did not ignore his need for medication but sent for him to receive his hepatitis C treatment and gave him back his wheelchair.[82]  The records show that the nursing and medical staff, along with Naik, were attentive to Plaintiff's situation and addressed it promptly.

Although Plaintiff complains that Naik and the other medical defendants "threatened" to take away his wheelchair in December 2011 and again in February 2012, the medical records indicate that the only time Plaintiff was without a wheelchair was from July 22, 2011 to August

---

[79] Medical Records Vol. I at Guthrie 24.

[80] *Id.* at Guthrie 28.

[81] *Id.* at Guthrie 36-54, 85-86.

[82] *Id.* at Guthrie 110-112.

2, 2011, after the therapists had noted that Plaintiff had made good progress with his therapy and could walk a substantial distance with the aid of the walker.

Dr. Bowers' uncontroverted expert report summarized the medical record and concluded that Naik "provided excellent medical care to Mr. Guthrie and [her] encouragement of the patient to participate in physical therapy and to discontinue use of his wheelchair was clearly done in the patient's best interest and done in hopes that the patient would find relief from his chronic pain."[83]   Further, regarding taking away Plaintiff's wheelchair and discharging him from assisted living, Dr. Bowers testifies that "the record clearly shows that the patient had achieved a level of independence that no longer required him being placed in Assisted Living or requiring a wheelchair."[84]   Dr. Bowers also pointed out that there is no record of Naik being responsible for ordering Plaintiff's pain medication.[85]   The records reflect, and the expert report indicates, that Ahmad was the physician responsible for ordering Plaintiff's pain medication.

In sum, the medical records and expert report refute Plaintiff's claim that Naik refused to treat him or acted with wanton disregard for Plaintiff's medical needs.  Plaintiff does not raise a fact issue that Naik violated Plaintiff's Eighth Amendment rights or that she acted objectively unreasonably towards him.  Accordingly, Plaintiff does not meet his burden to overcome Naik's entitlement to qualified immunity and his claims against her will be dismissed.

### 2.    Ahmad

Plaintiff contends that Ahmad failed to prescribe the kinds of medicine that Plaintiff believed were necessary to treat his pain.  Plaintiff complains that doctors at the UTMB pain

---

[83] Affidavit of Steven Bowers, M.D. at 20.

[84] Id.

[85] Id.

19 / 34

clinic recommended MS-Contin,[86] gabapentin, and nortriptyline for his pain control, and that Ahmad did not follow the UTMB's recommendations regarding pain medication.[87]

The medical records refute Plaintiff's claims about the medical care provided by Ahmad. The medical records show that Ahmad prescribed Neurontin,[88] Tylenol 3, and that Ahmad applied and eventually received authorization for Plaintiff to have morphine elixir.[89] Dr. Bowers testified that morphine is rarely used for chronic pain in prison and that TDCJ has a policy that limits use of morphine for pain management to patients with cancer or "one time orders for pain associated with acute trauma or severe medical condition."[90] The records also establish that Ahmad saw Plaintiff on more than thirty occasions in the eighteen months Plaintiff was under Ahmad's care and that Ahmad prescribed him numerous medications at the highest dosages allowable.[91]  *See Banuelos v. McFarland,* 41 F.3d 232, 235 (5th Cir. 1995) ("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference."). In fact, Dr. Bowers opined that Ahmad's efforts "clearly demonstrate[] that medical providers have gone far above the nationally recognized treatment guidelines for correctional medicine in regards to pain management for Mr. Guthrie."[92]

---

[86] According to the Federal Drug Administration's Medication Guide, MS-Contin is an extended-release form of morphine. *Available at* www.fda.gov/downloads/Drugs/DrugSafety/UCM311374.pdf.

[87] *See Naik*, Docket Entry No. 2 at ¶ 15.

[88] Neurontin is a brand name for gabapentin. *See* http://labeling.pfizer.com/ShowLabeling.aspx?id=630.

[89] *See Naik*, Medical Records Vol. I at Guthrie 282 (medical pass for morphine elixir).

[90] *See* Affidavit of Steven Bowers, M.D. at 21 (citing *CMC Pharmacy Policy and Procedure Manual*, Policy No. 20-05, Use of Controlled Substances).

[91] *See supra* note 12.

[92] Affidavit of Steven Bowers, M.D. at 21.

Although Plaintiff has expressed dissatisfaction with the assessment of his injury, and the type, extent, and effectiveness of the medications prescribed by Ahmad, the record negates any inference that Ahmad was deliberately indifferent to Plaintiff's serious medical needs.   The record shows, and medical expert Dr. Bowers concurs, that Ahmad did not refuse to examine or treat Plaintiff, did not delay his treatment, and did not intentionally treat him incorrectly.

Further, to the extent that Plaintiff was dissatisfied with Ahmad's professional judgment and conclusions about the best course of care, Plaintiff states no violation of the Eighth Amendment.   "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (finding active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); *Norton v. Dimazana*, 122 F.3d 286, 291-92 (5th Cir. 1997) (holding an inmate's dissatisfaction with the medical treatment he receives does not mean that he suffered deliberate indifference); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (holding inmate's "disagreement with his medical treatment" was insufficient to show Eighth Amendment violation).   Accordingly, Plaintiff fails to raise a fact issue that Ahmad was deliberately indifferent to his serious medical needs and therefore fails to show a constitutional violation.   Moreover, Plaintiff does not show that any of Ahmad's actions or omissions were objectively unreasonable.   Therefore, Ahmad is entitled to qualified immunity and Plaintiff's claims against him will be dismissed.

### 3.   Williams

Plaintiff alleges that Williams falsified medical records in order to facilitate previous

coworkers' attempt to remove Plaintiff's wheelchair.[93]  In his More Definite Statement, he also alleges that Williams told him that there was nothing wrong with him and that she would do whatever she could to stop further treatment as it relates to Plaintiff's pain condition because it was a waste of taxpayer dollars.[94]  Plaintiff also claims that Williams recommended that Plaintiff not be placed in assisted living, which he contends he needs for his condition.

As noted above, there is no evidence of any falsification of the medical records, and Plaintiff produces none.  Therefore, Plaintiff cannot defeat summary judgment based on his conclusory claim that Williams falsified his medical record.  *See Knighten*, 2003 WL 21355964, at *1.

Further, there is no evidence that Williams ever caused him to lose his wheelchair privileges.  The uncontroverted summary judgment evidence indicates that Williams started working for TDCJ at the Jester Unit on November 4, 2011, after the single incident in July 2011 where his wheelchair was taken away.[95]  It is undisputed that Plaintiff's wheelchair was not taken away after August 2, 2011.

Plaintiff also does not tie any of Williams's recommendations to any actual harm or raise a fact issue that her recommendations were the result of a wanton disregard for his serious medical needs rather than a disagreement regarding his medical treatment.  Again, the disagreement with medical care, and particularly a doctor's professional medical judgment, does not raise an inference of deliberate indifference.  *Domino*, 239 F.3d at 756 ("[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'"

---

[93] *See Naik*, Docket Entry No. 1.

[94] *Naik*, Docket Entry No. 10 at 3.

[95] Affidavit of Steven Bowers, M.D. at 10; *see also* Medical Records Vol. II, at Guthrie 137.

(quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976))); *Varnado*, 920 F.2d at 321.   Further, Plaintiff does not show that any of Williams' actions or omissions were objectively unreasonable or that she violated any of his constitutional rights.   Plaintiff does not meet his burden to show that Williams is not entitled to qualified immunity and therefore Plaintiff's claims against Williams will be dismissed.

### 4.    Susan Dostal

Plaintiff alleges that Dostal, as practice manager, was the "primary force" behind the plan to take away his wheelchair.[96]   Plaintiff alleges in his More Definite Statement that he and his mother wrote to Dostal about the plan to take away his wheelchair and that Dostal allegedly wrote back stating that Plaintiff would be evaluated by a wheelchair committee.[97]   He also contends that she was part of a "big meeting" to intimidate Plaintiff into giving up his wheelchair.[98]   Plaintiff also alleges that Dostal, as the direct supervisor, allegedly "did nothing to stop their illegal behavior" and failed to intervene to stop the "cruel behavior" of her coworkers and subordinates."[99]   Plaintiff further claims that Dostal prevented Ahmad from prescribing correct pain medications and that she is partially responsible for Plaintiff's blindness in his right eye because she allegedly failed to notify him that he had an appointment for eye surgery.[100]

As summary judgment evidence, Dostal produces the uncontroverted expert report of Dr. Bowers, who testified:

---

[96] *Naik*, Docket Entry No. 1 at 4.

[97] *Id.*, Docket Entry No. 10 at 11.

[98] *Id.*

[99] *Id.*; *Naik*, Docket Entry No. 2 at 8.

[100] *Naik*, Docket Entry No. 1 at 4; *id.*, Docket Entry No. 10 at 14.

> Dostal did not provide any medical care to [Plaintiff] during this time period.  In fact, Ms. Dostal's role as practice manager is solely an administrative position and she has no authority or responsibility to evaluate, treat, or order any type of medical treatment.  In her role, Ms. Dostal can only help facilitate the patient's access to care and there is no doubt [Plaintiff] received more than adequate medical care, of which he would often times refuse.[101]

Expert witness Dr. Bowers also testified that Dostal cannot schedule eye surgeries.[102] Because there is no evidence that Dostal had the authority to order medications or make the medical decisions regarding Plaintiff's care, Plaintiff does not raise a fact issue that Dostal was deliberately indifferent to his medical needs regarding those decisions.  *See Vasquez v. Dretke*, 226 F. App'x 338, 340 (5th Cir. Mar. 9, 2007) (not selected for publication) (holding that non-medical professionals who deferred to the judgment of medical professionals were not deliberately indifferent to a plaintiff's serious medical needs).

Moreover, to the extent that Plaintiff contends that Dostal was instrumental in the July 2011 removal of his wheelchair, the medical records show, as discussed above, that the medical professional decision to assign Plaintiff to the dorm with a rolling walker was not objectively unreasonable.[103]  Plaintiff does not raise a fact issue that Dostal, to the extent of her authority, was deliberately indifferent to his serious medical needs or that Dostal acted objectively unreasonably with respect to him.

Finally, to the extent that Plaintiff seeks to hold Dostal liable for the actions of her subordinates, there is no *respondeat superior* liability under section 1983.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691-93 (1978) (holding that supervisory officials cannot be held

---

[101] Affidavit of Steven Bowers, M.D. at 21.

[102] *Id.*

[103] *See* Affidavit of Steven Bowers, M.D. at 20; Medical Records Vol. I, at Guthrie 28, 33.

vicariously liable for their subordinates' actions under section 1983); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("'[S]upervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.") (citation omitted); *Alton v. Texas A&M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999) ("Supervisory officers . . . cannot be held liable under § 1983 for the actions of subordinates . . . on any theory of vicarious liability.").

Because Plaintiff does not raise a fact issue that Dostal violated his constitutional rights or that she acted objectively unreasonably in relying on the medical doctors' professional judgment, she is entitled qualified immunity, and, in turn, to summary judgment on Plaintiff's claims against her.

### B.      Individual Capacity Claims–Security Defendants

Plaintiff claims that Hudspeth and Miller retaliated against him for filing *Naik*.  Both Hudspeth and Miller assert their entitlement to qualified immunity for their conduct towards Plaintiff.

Although it is well established that a prison official may not retaliate against an inmate for complaining through proper channels about a prison official's misconduct, *Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008), a prisoner's personal belief that retaliation must have been the reason for the adverse action is insufficient to state a valid claim under 42 U.S.C. § 1983.  *See Jones v. Greninger,* 188 F.3d 322, 325 (5th Cir. 1999). "To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *McDonald v. Steward,* 132 F.3d 225, 231 (5th Cir. 1998).  "Causation requires a showing that but for the retaliatory motive the complained of incident . . . would not have

occurred." *Id.* (internal quotation marks and citations omitted).

The need for close scrutiny of individual retaliation claims is especially keen in the prison context.  The Fifth Circuit has admonished district courts: "To assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them, trial courts must carefully scrutinize these claims." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).  Accordingly, the Court has carefully scrutinized the claims against Hudspeth and Miller below and finds that Plaintiff cannot raise a fact issue on essential elements of retaliation in each case and does not meet his burden to overcome Hudspeth's and Miller's entitlement to qualified immunity.

### 1.    Hudspeth

Plaintiff alleges that on December 6, 2012, Hudspeth threatened Plaintiff with retaliation (taking away parole, false cases, demotion in class) if Plaintiff did not drop the *Naik* lawsuit. *Hudspeth*, Docket Entry No. 1 at 3.  Plaintiff alleges that thereafter, Hudspeth used his "command influence" to encourage other officers to shake down Plaintiff's cell, charge him with disciplinary cases, and place him in administrative segregation on "trumped up" charges.

To the extent that Plaintiff contends that Hudspeth used his "command influence" over his subordinates to issue disciplinary charges, conduct shakedowns, and place Plaintiff in administrative segregation, there is no evidence to raise a fact issue that Hudspeth had any personal involvement other than to verbally threaten Plaintiff.  *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992) (holding that a plaintiff bringing a section 1983 action must "specify the personal involvement of each defendant").  As stated previously, section 1983 does not create vicarious or *respondeat superior* liability for the wrongdoing of others.  *See Monell*, 436 U.S. at 691-93; *Iqbal*, 556 U.S. at 677.

Plaintiff's allegations against Hudspeth regarding harassing words and threats also do not establish a constitutional violation.   However offensive or threatening a correctional officer's comments may be, it is well established that verbal insults or harassment in the prison context do not amount to a constitutional violation and are not actionable under 42 U.S.C. § 1983. *See Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997); *Robertson v. Plano City of Texas*, 70 F.3d 21, 24 (5th Cir. 1995) (citing *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983)); *Bender v. Brumley*, 1 F.3d 271, 274 n.1 (5th Cir. 1993); *Spicer v. Collins*, 9 F. Supp. 2d 673, 683 (E.D. Tex. 1998) (citations omitted).

Moreover, the PLRA expressly provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e); *Geiger v. Jowers*, 404 F.3d 371, 374-75 (5th Cir. 2005). To the extent that Plaintiff's complaint against Hudspeth concerns verbal conduct that resulted only in emotional pain and suffering, his allegations fail to state a constitutional violation or a valid claim for relief under 42 U.S.C. § 1983.

Moreover, to the extent that Plaintiff maintains that Hudspeth was directly involved in the disciplinary charges against him, Plaintiff does not produce evidence to raise a fact issue that Hudspeth possessed retaliatory intent when Hudspeth required him to comply with prison rules and procedures.   Nor does Plaintiff raise a fact issue that retaliation was the cause of Plaintiff's receipt of the disciplinary charges.   Plaintiff's subjective belief and conclusory statements set forth in his pleadings are insufficient to survive summary judgment. *Freeman,* 369 F.3d at 860 (citations omitted); *Moody v. Baker,* 857 F.2d 256, 258 (5th Cir. 1988).

Accordingly, Plaintiff fails to establish his claim that Hudspeth retaliated against him for

filing *Naik*.   Because Plaintiff does not raise a fact issue that Hudspeth violated his clearly established constitutional rights, he does not meet his burden to overcome Hudspeth's entitlement to qualified immunity.   Accordingly, Plaintiff's claims against Hudspeth will be dismissed.

### 2.   Miller

Plaintiff alleges that Miller denied Plaintiff due process and retaliated against him by hearing false cases and assessing the maximum punishment.[104] In particular, Plaintiff claims that Miller was the hearing officer for his major case regarding the charge of asking his mother to pass along correspondence to another offender.[105] Plaintiff also alleges that Miller laughed at him when he was left in a hot car after being transported from Jester IV in May of 2013.[106]

To the extent that Plaintiff contends that Miller violated his due process rights in connection with his disciplinary hearings, prisoners charged with institutional rules violations are entitled to rights under the Due Process Clause only when the disciplinary action may result in a sanction that will infringe upon a constitutionally protected liberty interest. *See Sandin v. Conner*, 515 U.S. 472 (1995); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974).   In particular, only those sanctions that "inevitably affect the duration of [a prisoner's] sentence" may qualify for constitutional protection under the Due Process Clause. *Sandin*, 515 U.S. at 487.

For example, Texas inmates who are eligible for mandatory supervision have a constitutional expectancy of early release under the Texas mandatory supervision scheme and a protected liberty interest in the good-time credits that they have earned.  *Malchi v. Thaler*, 211

---

[104] *Hudspeth*, Docket Entry No. 1 at 3.

[105] *Hudspeth*, Docket Entry No. 7 at 7.

[106] *Id.* at 6.

F.3d 953, 956 (5th Cir. 2000) (addressing the mandatory supervision scheme in place prior to September 1, 1996); *see also Teague v. Quarterman*, 482 F.3d 769 (5th Cir. 2007) (addressing the mandatory supervision scheme in place before and after September 1, 1996). Thus, if a prisoner is eligible for mandatory supervision, prison officials may not forfeit good-time credit during a prison disciplinary hearing without providing the requisite level of due process.

Here, Plaintiff acknowledges that he is not eligible for mandatory supervision.[107] Accordingly, he does not have a protected liberty interest in his good time credits. *Malchi*, 211 F.3d 953, 956. Further, Plaintiff's temporary loss of privileges, cell restrictions, loss of commissary privileges, assignment to administrative segregation, or a reduction in classification status do not implicate a liberty interest of the sort protected by the Due Process Clause. *See Madison v. Parker*, 104 F.3d 765, 768 (5th Cir. 1997) (holding that sanctions that are "merely changes in the conditions of [an inmate's] confinement" do not implicate due process concerns and do not pose an atypical or significant hardship beyond the ordinary incidents of prison life). The Fifth Circuit has also held that reductions in a prisoner's class status and the potential impact on good-time credit earning ability are not protected by the Due Process Clause. *See Malchi*, 211 F.3d at 958; *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995).

Because the sanctions imposed against Plaintiff as a result of his disciplinary conviction do not implicate a protected liberty interest, he fails to demonstrate a constitutional violation in connection with the punishment that he received. Accordingly, the Defendants are entitled to summary judgment on this issue.

To the extent that Plaintiff contends that Miller retaliated against him for filing *Naik*, Plaintiff does not raise a fact issue that any of Miller's actions rose to the level of a constitutional

---

[107] *Hudspeth*, Docket Entry No. 31 at 14.

violation or that Miller's finding of conviction was caused by a retaliatory motive rather than Plaintiff's violation of the prison rules.  Plaintiff also submits no evidence to raise a fact issue that retaliation was the but-for cause of his disciplinary conviction.

In sum, Plaintiff does not raise a fact issue that Miller violated any of his clearly established constitutional rights.  Thus, he cannot meet his burden on Miller's entitlement to qualified immunity.  Accordingly, Plaintiff's claims against Miller will be dismissed.

## VI.    Other claims

### A.    ADA/RA

Plaintiff claims that the Medical Defendants violated his rights under the Title II of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12132.  To establish a claim under the ADA, the plaintiff must show (1) that he is a qualified individual under the Act; (2) that he is being excluded from participation in or being denied benefits of services, programs, or activities for which the defendants are responsible, or that he is otherwise being discriminated against by the defendants; and (3) that this exclusion, denial of benefits, or discrimination is by reason of the disability. *Lightbourn v. County of El Paso, Texas,* 118 F.3d 421, 428 (5th Cir. 1997). Title II of the ADA applies to state prison facilities and state prison services. *See Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 210 (1998).

First, Plaintiff cannot recover from defendants in their individual capacity under the ADA. *See Cole v. Velasquez,* 67 F. App'x 252 n.ll (5th Cir. 2003) (not designated for publication).  And, as previously stated, Plaintiff's release from prison moots his claims for injunctive relief against defendants to the extent he asserts such a claim against defendants in their official capacity.  *See Herman*, 238 F.3d at 665.

"To recover money damages, a plaintiff must prove that the discrimination was

intentional." *Wells v. Thaler*, 460 F. App'x 303, 311-12 (5th Cir. 2012) (citing *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002)). Plaintiff raises no fact issue that he was deprived of services, activities, or programs because of intentional disability discrimination.

Additionally, as discussed above, the gravamen of Plaintiff's claims is that medical professionals made medical decisions involving the propriety of taking away his wheelchair for eight days and moving him out of the infirmary.   Plaintiff's efforts to recast his medical indifference claim as an ADA claim fail as a matter of law, because insufficient or negligent medical care is not cognizable under the ADA or Rehabilitation Act. *See Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012) ("The ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners.'" (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996)); *Doe v. Pfrommer*, 148 F.3d 73, 84 (2d Cir. 1998) (holding that plaintiff's challenge to the "substance of the services provided to him through [the Vocational Educational Services for Individuals with Disabilities]" did not state a claim under the ADA or Rehabilitation Act); *see also Burger v. Bloomberg*, 418 F.3d 882, 882 (8th Cir. 2005) (medical treatment decisions not a basis for Rehabilitation Act or ADA claims); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (Rehabilitation Act not intended to apply to medical treatment decisions); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (medical decisions and medical negligence not ordinarily within scope of ADA or Rehabilitation Act).   Because Plaintiff's claims regarding the Medical Defendants' medical treatment decisions based on their professional medical judgment are not cognizable under the ADA, Defendants are entitled to summary judgment on Plaintiff's ADA claims.

###### B.      Breach of Settlement Agreement

To the extent that Plaintiff asserts that any defendants breached the August 2008 settlement agreement arising out of the *Hulipas* case, a mere breach of contract will not suffice to state a claim under section 1983.  *Whiting v. Univ. of S. Mississippi*, 451 F.3d 339, 345 (5th Cir. 2006) (citing *Bishop v. Wood*, 426 U.S. 341, 349-50 (1976)).  "While a plaintiff may have an action in state court for damages for breach of contract, he may not sue under § 1983 unless his constitutional rights have in some way been denied or the exercise of those rights penalized in some way."  *Id.*

To the extent that Plaintiff seeks the enforcement of the 2008 settlement agreement, "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction" where, as here, the dismissal order neither incorporated the terms of the settlement agreement nor set forth its enforcement as a term of dismissal.  *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 382 (1994).  Accordingly, Plaintiff's claim for breach of the 2008 settlement agreement or enforcement of that agreement is not cognizable under section 1983 and sounds, if at all, in state contract law.

A Court must determine whether it has jurisdiction to hear a case.  Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331. In addition, federal district courts have supplemental jurisdiction over state-law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A federal district court may decline to exercise supplemental jurisdiction over a claim if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* § 1367(c) (West 2016).   Because all of Plaintiff's federal claims have been dismissed against all defendants as set forth above, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law breach of contract claim.  *See id.* §1367(c)(3).  Accordingly, Plaintiff's breach of contract claim will be dismissed without prejudice for lack of jurisdiction.

## VII.   Conclusion and Order

Based on the foregoing, the Court **ORDERS** as follows:

1.      Defendants Naik's, Williams's, Ahmad's, & Dostal's Motion for Summary Judgment (Docket Entry No. 249) is **GRANTED**, and Plaintiff's Eighth Amendment and ADA claims against them are **DISMISSED** with prejudice; and Plaintiff's breach of contract claim is **DISMISSED** without prejudice for lack of jurisdiction.

2.      Defendants Hudspeth's and Miller's Motion for Summary Judgment (Docket Entry No. 251) is **GRANTED**, and all of Plaintiff's claims against them are **DISMISSED** with prejudice.

3.      Plaintiff's consolidated action is **DISMISSED** in its entirety against all defendants.

4.      All other pending motions, if any, are **DENIED**.

33 / 34

The Clerk will send a copy of this Order to all parties of record.

SIGNED at Houston, Texas, this 28th day of February, 2017.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE